HIGHWAY TRUCK DRIVERS AND HELPERS LOCAL 107, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 15101.

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 13, 1959.

Decided Dec. 23, 1959.

Mr. Richard H. Markowitz, Philadelphia, Pa., of the bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave of Court, with whom Mr. Norman S. Altman, Washington, D. C., was on the brief, for petitioner.

Mr. Melvin Pollack, Atty., N. L. R. B., with whom Messrs. Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Alfred Avins, Atty., N. L. R. B., were on the brief, for respondent.

Before WILBUR K. MILLER, FAHY and BURGER, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

Pursuant to charges made by Virginia-Carolina Freight Lines, Inc., the General Counsel of the National Labor Relations Board filed with the Board on August 26, 1958, a complaint alleging Highway Truck Drivers Local 107 of the Teamsters union [1] had engaged in unfair labor practices in violation of subsections (1) (A) and (4) (A) of § 8(b) of the National Labor Relations Act as amended, 29 U.S.C.A. § 151 et seq., 61 Stat. 136.[2]

Specifically the General Counsel alleged that on or about July 15, 1958, and on other dates, one William "Goldie" James, a representative of the Teamsters union, threatened employees of Virginia-Carolina with violence to their persons and trucks and so restrained and coerced them in the exercise of rights guaranteed by § 7 of the Act; and that on or about July 15, 1958, the Teamsters union through its representative James ordered, directed, instructed and appealed to the employees of David Weber Company not to unload the trucks of Virginia-Carolina, with an object of forcing or requiring Weber to cease doing business with Virginia-Carolina.

After conducting a hearing, a trial examiner filed an Intermediate Report in which he made findings of fact, upon the basis of which he concluded the Teamsters union had engaged in the unfair labor practices with which it was charged, and recommended that a cease and desist order be entered.

The Board affirmed the rulings of the examiner, adopted his findings, conclusions and recommendations,[3] and ordered that the Teamsters union, its officers,

---

1. The full name is "Highway Truck Drivers and Helpers Local 107, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America."

2. These sections and the related § 7 are as follows:

    Sec. 8(b). "It shall be an unfair labor practice for a labor organization or its agents—

    "(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7: *Provided*, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; * * *

    * * * * *

    "(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an ob-

ject thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; * * *."

    "Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3)."

3. With slight modifications not pertinent here.

representatives, agents, successors and assigns:

"1. Cease and desist from:

"(a) Inducing or encouraging employees of David Weber Company, or any other employer, to engage in a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities, or to perform any services for their employer, where an object thereof is to force or require David Weber Company or any other employer to cease doing business with Virginia-Carolina Freight Lines, Inc.

"(b) Restraining and coercing the employees of Virginia-Carolina Freight Lines, Inc., by threats of physical harm, or by like or related conduct restraining or coercing employees of other employers doing business with Virginia-Carolina Freight Lines, Inc., in the exercise of their rights under Section 7 of the Act."

The Teamsters union has petitioned for review of the Board's order and the Board has asked us to enforce it.

The findings made by the examiner and adopted by the Board, which we think are supported by substantial evidence in the record considered as a whole, may be quickly summarized.

In the early morning of July 15, 1958, four Virginia-Carolina trucks with merchandise for David Weber Company arrived at the latter's plant in Philadelphia. As the Weber receiving bay could accommodate only one vehicle, it was necessary for the trucks to be unloaded one at a time. Before 9:00 a. m. the first Virginia-Carolina truck had been unloaded and the second was in the receiving bay. Charles Echols, the last driver to arrive, was about to move his truck to allow Walter Branch, the driver of the third truck, to back into the bay, when William James, an organizer for the union, arrived in an automobile which

he parked in such a position as to prevent Echols from moving. James had been sent by the union, which was striking against Virginia-Carolina, to "get" its trucks at the Weber plant.

The organizer asked Echols why he was working and whether he was "trying to foul things up," and took Echols' name and address. He approached Pratt, a helper on Branch's Virginia-Carolina truck, mentioned the strike, and said "if this kept up somebody might get hurt." This statement seems to have intimidated Pratt, for he gave a fictitious name when James demanded that he identify himself. After this episode, James reprimanded Branch for working during the strike, and went to the Weber receiving bay where Halmon and Green, Weber employees, had just finished unloading a Virginia-Carolina truck. Halmon heard James say they were not supposed to unload Virginia-Carolina trucks.

James remained at the scene all day and at times acted as a picket. He testified, *inter alia*, of a conversation he had with one Marshall Corum, a Virginia-Carolina driver. He attributed foul and abusive language to Corum, to which he said he replied in kind, and quoted the driver as saying, "I am going to make a living, and you are not going to stop me." James said he replied, "We are going to stop you if you back in."

The parties have stipulated that four questions are presented here. The first question is

"Whether substantial evidence on the record as a whole supports the Board's finding that petitioner violated Section 8(b) (4) (A) of the National Labor Relations Act, by inducing and encouraging employees of David Weber Company to engage in concerted refusals in the course of their employment to perform work or services for their employer, for an object of forcing or requiring Weber to cease doing business with Virginia-Carolina Freight Lines, Inc."

The Teamsters union argues that the Board's finding of a violation is based *solely* upon an inference that the union's picket made a statement to an employee of the secondary employer and that "the inference was made * * * despite the fact that the employe did not know the statement was made to him. Substantial evidence in this case does not support the Board's finding that the Union's conduct was directed at the secondary employer."

We are constrained to reject the argument. Halmon and Green were Weber employees whose duty it was to unload incoming trucks. Halmon heard the organizer say "we wasn't supposed to unload" Virginia-Carolina trucks. In an affidavit made soon after the occurrence, Green quoted James as saying, "You aren't supposed to unload Virginia-Carolina;" and in an accompanying affidavit Halmon agreed James had made the statement. In testifying before the trial examiner, however, he said he did not know the picket's remark was addressed to him and Green. Obviously he did know it, however, for he admitted that he and Green did the unloading.[4] Clearly, the organizer's remark was addressed to them, and not to Virginia-Carolina drivers who did not unload their trucks. No more Virginia-Carolina trucks were unloaded that day. The union says unloading was stopped solely on the order of the Weber superintendent. It seems fair to assume, however, that the order was given because of the organizer's protest against participation in the work by Weber employees. But, regardless of whether the union succeeded in inducing Weber employees to stop unloading Virginia-Carolina trucks, its attempt to do so was an unfair labor practice.

We hold therefore that the purpose behind James' direct appeal to Weber employees not to unload Virginia-Carolina trucks was "to tie up the freight," as he put it, and so to force Weber to cease doing business with Virginia-Carolina. This was a violation of § 8(b) (4) (A) of the Act.

■ The second question is

"Whether substantial evidence on the record as a whole supports the Board's finding that petitioner threatened employees of Virginia-Carolina with physical harm, in violation of Section 8(b) (1) (A) of the Act."

There was substantial evidence on the whole record that the Teamsters union through its picket-organizer threatened bodily harm to Virginia-Carolina drivers if they continued to operate their trucks during the strike. This tended, we think, to restrain and coerce the threatened employees in the exercise of their right to refrain from cooperating with the Teamsters union in its strike against the Virginia-Carolina company. The right to refrain from such "concerted activities" is guaranteed by § 7 of the Act. We conclude therefore that the record shows a violation of § 8(b) (1) (A) of the Act.

■ The third question is

"Whether the Board's Order remedying the alleged violation of Section 8(b) (1) (A) of the Act is valid and proper in view of the nature of the alleged violation."

The Teamsters union says this question should be answered in the negative because the alleged violation consisted of the "single isolated statement" that "somebody might get hurt." We cannot agree that a threat of physical violence should be disregarded because the evidence does not show it was repeated. James' threat constituted positive and purposeful action to deter the Virginia-Carolina drivers from working to avoid physical harm; the Board was, therefore, clearly warranted in characterizing it as unlawful.

■ The fourth question is

"Whether the Board's Order pertaining to the alleged violations of Sections 8(b) (1) (A) and 8(b) (4) (A) of the Act is valid and proper insofar as it extends in scope to 'any

4. Halmon was asked, "Now, who did the unloading?" He answered, "I and John Green."

other employer' or to 'employees of other employers.' "

We think the Board's order should be limited to the employees of the Virginia-Carolina company and the David Weber Company, with respect to whom it was proved the union had violated §§ 8(b) (1) (A) and 8(b) (4) (A). The words "or any other employer" in paragraph 1(a) of the Board's order, and the words "or by like or related conduct restraining or coercing employees of other employers doing business with Virginia-Carolina Freight Lines, Inc." in paragraph 1(b), will be stricken from the order.

As so modified, the order will be enforced. The notice to be posted by the Teamsters union will be corrected accordingly.

So ordered.